**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**GUIDEONE MUTUAL INSURANCE COMPANY
and GUIDEONE AMERICA INSURANCE
COMPANY**                                                    **PLAINTIFFS**

**V.**                                              **CAUSE NO.: 1:06-CV-218-SA-JAD**

**KENNETH ROCK and JANET ROCK
DEFENDANTS**

## DEFENDANTS' MEMORANDUM IN SUPPORT OF DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S. MOTION FOR SUMMARY JUDGMENT

**COME NOW**, Defendants, KENNETH ROCK and JANET ROCK, and through their counsel, and file this Memorandum in Support of Defendant's Response in Opposition to Plaintiffs' Motion for Summary Judgment. In support thereof, Defendants' would show unto the Court the following facts, to-wit:

### I.    INTRODUCTION

The Plaintiffs have moved this Court for Summary Judgment alleging that coverage of the Defendants' home and auto claims was validly denied or rescinded. Plaintiffs' further allege that they are entitled to Summary Judgment as to the Defendants' bad faith counterclaims because the Defendants must first show that they are entitled to coverage before they can establish a bad faith claim, and, that the Plaintiffs' investigation into these claims was conducted fairly and in good faith.

These Plaintiffs' decided, within two days of the subject fire, that they would, construct an arson claim out of this substantial loss. The Plaintiffs, at all relevant times, conducted a results oriented investigation, that they were determined from the "get-go" would end in an eventual denial letter being sent to the Defendants.  The Plaintiffs' Motion for Summary Judgment, as drafted, does not resolve a single issue of material

fact, or present this Court with sufficient summary judgment evidence that supports a finding that there is no triable fact issue in this cause.

Therefore, the Defendants' pray that this honorable Court will deny the Plaintiffs' Motion for Summary Judgment in its entirety.

## II.      SUMMARY JUDGMENT STANDARD

District courts may properly grant summary judgment only if, viewing the facts in the light most favorable to the non-movant, the movant shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c).*

Summary judgment shall only be rendered when the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett.*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of identifying the basis for its belief that there is an absence of a genuine issue for trial, and pointing out those portions of the record that demonstrate such an absence. *Id.* Once the movant has made this initial showing, the nonmoving party must present competent summary judgment evidence to show a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Such evidence consists of specific facts that show a genuine fact issue, such that a reasonable jury might return a verdict in the nonmoving party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III.     STATEMENT OF THE FACTS

In April 2004, the home of Kenneth and Janet Rock was insured under a policy of insurance with Farmers Insurance[1]. *See* GuideOne Insurance Homeowner's Application,

---

[1]  Plaintiff's version of the facts as related to this issue are incorrect and disputed.

attached hereto as Exhibit "A", at p. 2, and Deposition of Tina Bailey, attached as Exhibit "L" to [Doc. 166] (referred to herein as Exhibit "L"). In an effort to explore potentially lower premiums by insuring their home through GuideOne, Janet Rock, contacted Tina Bailey, a GuideOne agent, to obtain a quote for homeowner's insurance.

During this telephone conversation, Tina Bailey, took notes for two purposes 1.) to prepare a quote, and 2.) to determine eligibility. *See* Exhibit "L" at p. 25. Agent Bailey asked several, very specific[2] questions of Janet Rock related to eligibility and preparing a quote. *Id.* Tina Bailey recorded notes during this conversation which represented "information that Janet [Rock] gave me [Tina Bailey] either voluntarily of an answer to my question." *Id.* at p. 24. Using the information voluntarily conveyed by Defendant Janet Rock or supplied by Janet Rock in response to a question by Tina Bailey, Agent Bailey prepared an application for a homeowner's insurance policy on behalf of the Rocks. Agent Bailey, using her notes from her conversation with Defendant Janet Rock, entered necessary information into a GuideOne computer system and pre-printed the application for completion by Janet and Kenneth Rock. [Doc. 168] at p. 4. Agent Bailey filled in some portions of the application and the computer system "blocked in" the answers to several questions based upon the information Agent Bailey provided to the system. *See* Exhibit "L" at p. 94.

Of particular relevance to this litigation, is that Agent Bailey, herself, checked the box (or entered the information which caused the relevant box to be checked automatically by the computer system) indicating that no member of the Rock's household had ever been convicted of anything other than a traffic violation. *See* Exhibit "A" at p. 2, Exhibit "L" at p. 99, line 16-17. Agent Bailey supplied the system with this information despite the fact that her notes, which recorded the information Agent Bailey had been provided voluntarily by Janet Rock, or in response to questions posed by Agent

---

[2] Plaintiff has characterized this telephone conversation as talking "generally". This information is incorrect and disputed.

Bailey, contain absolutely no reference whatsoever to 1.) Tina Bailey asking Janet Rock if any member of the household had ever been convicted of anything other than a traffic violation, or 2.) a response or offer of information by Janet Rock that no member of the household had ever been convicted of anything other than a traffic violation. *See*, 0031agent, attached as Exhibit "M" to [Doc. 165] (referred to herein as Exhibit "M"). Tina Bailey pre-printed the application and drove the same to the Rock's home for Kenneth Rock's signature. *See* Exhibit "L" at p. 78, 99. Agent Bailey presented the application to Janet Rock, and looked on as Kenneth Rock, signed the application without reviewing the document. *See*, Affidavit of Kenneth Rock, attached hereto as Exhibit "B", see also Affidavit of Janet Rock attached hereto as Exhibit "B1". After collecting her check, Agent Bailey left the Rock's home.

On or about the 27th day of August, 2005, the Defendants' home and two automobiles were totally destroyed by fire. Later that same day, the Defendants' called Tina Bailey, their insurance agent, to report the loss. Deposition of Tina Bailey, 128, 136. Two days later, after Charles McAdory was assigned as the claims adjuster for the homeowner's claims, McAdory met with Defendants to begin the claims adjusting process. [Doc. 168] at p. 10. On August 30, 2005, Charles McAdory advised several GuideOne employees that he (the homeowner's claim adjuster), Milton Cook (the automobile claims adjuster), and Kathleen Alverio (of GuideOne's Special Investigative Unit), had met with the Defendants' to begin the adjusting process. Exhibit "O" to [Doc. 165] (referred to herein as Exhibit "O". Immediately, Don York, of the subrogation department, responded and advised that as this would be a "substantial loss" arson should be looked into as a potential cause of the fire. *Id.* Given that directive from York, McAdory assigned Rick Ely to investigate the fire scene. *Id.*

On August 30, 2005, Rick Ely confirmed receipt of the assignment and agreed to provide a verbal report immediately upon completion of his examination of the fire scene and a preliminary report to follow immediately thereafter. See, Receipt of Assignment for

Investigation, attached hereto as Exhibit "D1". Rick Ely visited the fire scene, examined the same, took photographs, collected samples of the debris, had those samples tested, and the tests revealed no ignitable liquid whatsoever[3]. *See,* AK Report 9-7-2005, attached hereto as Exhibit "E1", see also AK Report 9-23-2005 attached as Exhibit "F". After completing his investigation, on September 2, 2005, Rick Ely issued his Preliminary Report finding that the fire originated in and around the kitchen area. *See,* Exhibit "G", attached hereto. Ely advised in his initial September 2, 2005 transmission that a complete report would follow. Mr. Ely's investigation was completed at that time and he did not intend to conduct further investigation unless specifically directed to do so by GuideOne. *Id.* That very day, September 2, Kathleen Alverio contacted Rick Ely via telephone to request that he provide her with a copy of the Preliminary Report. *See,* Exhibit "H1" attached hereto. Also, on September 2, 2005, after receipt and review of Ely's Preliminary Report, GuideOne assigned Ely to do "additional investigation." See, Activity Form, attached hereto as Exhibit "I-1" at 9/2.

On September 2, 2005, GuideOne decided that this **would** be an arson case. Rick Ely's findings were not good enough, and GuideOne was not about to allow Rick Ely to issue a complete report, saying that this fire originated in the kitchen, that there was no evidence of any ignitable accelerant contained within the homes debris, and issue a check for these legitimate claims.

On September 2, 2005, Alverio contacted Ely by telephone to discuss the Preliminary Report. *See* Exhibit "G." The Defendants cannot be certain how many telephone conversations occurred between Alverio and Ely between September 2 and September 12, but the Defendants are certain that Rick Ely did not issue his complete report within ten "working days" as the Preliminary Report stated. Exhibit "G." On September 27, 2005, Dan Webb, attorney for GuideOne, contacted Rick Ely and the two

---

[3]  The Defendants would show that these two "samples" were not mere test tubes. The tested samples were each one-gallon containers of debris from the fire scene. *See*, Exhibit "E1".

scheduled a meeting, at Dan Webb's office, for September 29, 2005. *See* Activity Form, attached hereto as Exhibit "J" at 9/27. On September 29, 2005, Rick Ely spent eight (8) hours[4] with Dan Webb discussing the Rocks claims. *See* Invoice attached as Exhibit "K". After a nearly one (1) month delay between issuing his Preliminary Report, within twenty-four (24) hours of the conclusion of his meeting with GuideOne's attorney, Rick Ely issues his final "Full Report." *See* Full Report, attached hereto as Exhibit "L1".

In Ely's "Final Report" he completely ignores the findings of his Preliminary Report and makes absolutely no reference to the same. *Id.*. Ely determines that "the only way" this type of damage could have occurred is due to an "excessive fuel load and/or the presence of some type of flammable liquid chemical or accelerant." *See* Exhibit "L1" at p. 4. On or about August 30, 2005, Rick Ely collected two (2) samples of material from the fire scene, and submitted the same for analysis. No ignitable liquid was found. After being instructed to conduct additional investigation, Rick Ely tried it again. He collected three additional, one-gallon containers of debris from the fire scene. Again, no ignitable liquid could be found.  When Rick Ely issued his report, he was in possession of the laboratory reports of all five samples[5]. However, his report makes no mention of the fact that though he bases the entire conclusory framework of his Full Report upon his contention that "some type of flammable or combustible liquid, chemical or accelerant was introduced to the scene" there is no evidence, scientific or otherwise, that any combustible liquid was introduced to this scene.

Ely goes beyond ignoring his Preliminary Report to lying under oath about the existence of such report. In response to deposition questioning, Mr. Ely responded as follows:

---

[4]  Lest the Plaintiffs assert that this meeting was not eight (8) hours in duration, though Invoice 5066a, Exhibit "K", appears to indicate that the eight (8) hour work day was split between a meeting with Dan Webb and an interview of "Brooks" in Saltillo, Mississippi, Ely's more detailed "Activity Form", Exhibit "I" indicates that Attorney Dan Webb was to "locate Brooks and interview" him. *Id.*

[5]  The Laboratory Report for samples 1 and 2 was submitted to Ely on September 7, 2005. The Laboratory Report for samples 3,4, and 5 was submitted to Ely on September 23, 2005. *See* Exhibit "F".

Q:     Are all of the opinions that you have expressed with regard to the origin
       and cause of the Rocks' - - the fire that occurred at the Rocks' house
       contained within Exhibit 1 [Ely's Full Report]?

A:     Yes.

Q:     Have you formed any other opinions that are not contained within
       Exhibit 1 with regard to the fire that happened at the Rock's home on
       August the 27th of 2005?

A:     No ma'am, not that I recall.

Deposition of Rick Ely at p. 14.

Plaintiffs did not, at any reasonable time, produce this Preliminary Report to the
Defendants. Defendants counsel happened upon the Report by a stroke of luck and an
exercise of sleuth work that should never be required under the Rules of Evidence, Civil
Procedure, or Professional Responsibility[6].

Rick Ely's initial opinions with regard to this fire were completely altered before
he issued a full report after meeting with the attorney for GuideOne. These Defendants
were **absolutely entitled** to this Preliminary Report within thirty (30) days of their
service of Requests for Production of Documents, to depose Rick Ely on its contents, and

---

[6]  Defendants' counsel happened upon a photograph, intentionally produced by the Plaintiffs
among several other photographs, which depicted the front cover of an unassuming file folder.
This photograph depicted a "File Status Report" which indicated that a Preliminary Report had
been both dictated and provided to GuideOne. Defendants' counsel, thereafter, made an
additional request, over and above the relevant Requests for Production of Documents, and was,
finally, produced a copy of the Preliminary Report on April 17, 2009. Defendants' counsel
specifically asked Rick Ely during his deposition if any other opinions had been formed regarding
this incident fire. Rick Ely lied under oath regarding the existence of a Preliminary Report, the
Plaintiffs knowingly and intentionally withheld this Report from Defendants, and, it was the
intent of every relevant party associated with the Plaintiffs' that this entire litigation would unfold
without Defendants having an opportunity to uncover the events or conversations which led Rick
Ely to completely alter his opinions between the issuing of his Preliminary Report, followed by a
nearly one month delay, and a meeting with GuideOne's attorney, Dan Webb, and the eventual
completion of a Full Report within twenty-four (24) hours of meeting with Dan Webb. This
behavior is willful, intentional, a complete violation of discovery rules, and yet another example
of the Plaintiffs' lack of good faith and fair dealing in this matter beginning as early as September
2, 2005.

to have Rick Ely give an honest and truthful answer to deposition questioning regarding the same. The Defendants were deprived of each.

Because Rick Ely could not find "evidence supporting a conclusion" that any electrical devices were the cause of the fire, he concluded that the fire was not electrical in origin. Deposition of Rick Ely at 47. Rick Ely also could not find any evidence supporting a conclusion that any ignitable liquid was introduced to the fire scene, but he was comfortable in making that conclusion because it aligned with Dan York's initial directive that arson be looked into and the subsequent meeting with Dan Webb the day before the report was issued.

On September 30, 2005, GuideOne had the arson determination they requested on August 30, 2005 in hand. Now, the Plaintiffs could proceed with spending the next ten (10) months, writing their denial letter, before issuing the same on July 31, 2006.

## IV. LAW AND ARGUMENT

### COVERAGE

1. **The cause and origin of the subject fire are not before this honorable Court as issues for summary judgment.**

The Plaintiffs have asked this honorable court to grant summary judgment as to coverage and the Defendant's bad faith counterclaims. Therefore, the Defendant's version of the factual background related to the cause and origin of the subject home fire, fully set forth in the Defendant's Motion for Summary Judgment [Doc. 166], are not rehashed for the Court in this Response. The cause and origin of the fire, the Rocks' whereabouts at the time of the fire, the purported physical evidence and lack thereof, and many other tangents mentioned in Plaintiffs' Motion for Summary Judgment are not raised as legal arguments such that they are at issue in the Plaintiff's Motion for Summary Judgment.

The Plaintiffs raise only two issues in their Motion for Summary Judgment: 1.) Summary Judgment should be granted because of material misrepresentations on the

application; 2.) Bad Faith claims are barred because coverage does not exist and the Plaintiffs' investigation was conducted in good faith. The Plaintiffs have not alleged, and are now barred from alleging, that the Plaintiff's accusation that the Defendants' had some alleged involvement in the cause and origin of this fire are summary judgment evidence to be considered by the Court in ruling on the instant motion. *See, McDaniel v. Mississippi Baptist Medical Center*, 869 F.Supp 445, S.D. Miss., 1994 (District Court refused to consider arguments raised for the first time in its rebuttal memorandum in support of its motion for summary judgment). Therefore, only factual issues related to coverage and bad faith are contained herein. To be clear, how the Defendants' home and automobiles came to be totally destroyed by fire is **absolutely irrelevant** to whether or not they made material misrepresentations on their application for homeowner's insurance. Further, how the Defendants' home and vehicles came to be totally destroyed by fire is absolutely irrelevant to the Plaintiffs' arguments in its Motion for Summary Judgment that they were justified in denying these claims and rescinding coverage because of the Defendants' alleged misrepresentations.

The Plaintiffs have asked this honorable Court to find that the Defendants made material misrepresentations on their application and grant summary judgment on all claims as a result. On the date the Plaintiffs allege that Defendants made material misrepresentations on their homeowner's insurance application, their home had not burned to the ground. The subsequent claims under these relevant insurance policies, and how those claims arose, have no bearing whatsoever on whether or not the material misrepresentations were made at the time of application.

The Plaintiffs have submitted thirty (36) pages nearly entirely composed of "evidence" of why the Rocks "did it." Whether or not the Rocks "did it" is wholly and completely irrelevant to this Motion for Summary Judgment and the Defendant's response thereto. The Plaintiffs have not, for whatever reason, asked this Court to grant Summary Judgment because the Rocks' "did it." Therefore, circumstantial "evidence"

purporting to support Plaintiffs' theory that Defendants burned down their own home, is improperly before this Court, in the instance of a Summary Judgment motion which does not ask for relief on that ground. The Plaintiffs have attempted to try their case on paper and prove to this Court, which, of course, cannot act as a fact finder in this cause, that the Rocks "did it." However, thirty six (36) pages of purported "evidence" showing why the Plaintiffs have concluded that the Rocks burned their house down does not support the Plaintiffs' Motion that this Court grant summary judgment because material misrepresentations on the part of the Defendants negate the existence of coverage.

2.    **The existence or legitimacy of an insurance carrier's stated reason for denial of insurance claims is a genuine issue of material fact for a jury.**

A.    **Alleged Material Misrepresentations regarding the Defendants' financial status**

The Plaintiffs have not argued, and are now barred from arguing[7], that the Defendants made any misrepresentation, material or otherwise, regarding their financial situation, at the time they made their application for insurance. The Plaintiffs have argued that the Defendants are not entitled to coverage under their homeowner's and automobile insurance policies because of "the Rocks' failure to provide relevant information during the claims (and litigation) process regarding their financial situation." [Doc. 168] at p. 1.

On August 29, 2005, two days after their home and automobiles burned, the Defendants executed an "Authorization To Obtain Information," provided to them by the Plaintiffs, which authorized Plaintiffs to obtain any and all relevant information related to their "personal finances, bank statements, financial statements, employment, credit rating

---

[7]    **Error! Main Document Only.** *See, McDaniel v. Mississippi Baptist Medical Center*, 869 F.Supp 445, S.D. Miss., 1994 (District Court refused to consider arguments raised for the first time in its rebuttal memorandum in support of its motion for summary judgment).

and reports", etc., and a host of other information. See, Authorization attached as Exhibit "C" to [Doc. 165].

The Defendants executed such authorization, prepared by the Plaintiff, which made their financial lives an open book. The issue here is not whether or not the Defendants gave Plaintiffs sufficient authority to investigate their personal finances. The fact is that the Plaintiffs simply did not like what they found when they looked into the Defendants' finances because the Plaintiffs' investigation into the Defendants finances did not reveal any evidence to substantiate Plaintiffs' unfounded suspicions that Defendants were involved in the loss of their property.

In addition to signing the "Authorizations to Obtain Information", Defendants, despite having had their home and all of its contents completely destroyed by fire, brought as many of the documents requested of them to their respective Examinations Under Oath as possible.

Kathleen Alverio, a Special Investigative Unit Senior Investigator with GuideOne Insurance, signed the denial and recision letter received by the Defendants. See, Exhibit "N" at p. 6. When Ms. Alverio was questioned regarding this Authorization to Obtain, she responded as follows:

> Q:     Let's just kind of go through – what did you call this
>        document?
>
> A:     An ATO or an authorization to obtain.
>
> Q:     All right.  And what is your understanding of what
>        an authorization to obtain allows GuideOne to
>        obtain?
>
> A:     Credit information is what I look for, and I run my
>        own CLUE reports.
>
> Q:     All right.  Are you also able to access bank
>        statements?
>
> A:     We sometimes make that request.

Deposition of Kathleen Alverio, attached as Exhibit "H" to [Doc. 165] at p. 40 (referred to herein as Exhibit "H").

Continuing with her deposition testimony, Ms. Alverio stated:

Q:      … I want to stop right there.  What is it that you contend Janet and Kenneth Rock failed to do in cooperating in the investigation?

A:      Exactly what it states in the following sentences.

Q:      Is all the information that is requested in that seven-page letter necessary for you to make a determination in your investigation in the SIU unit?

A:      It would assist with the continuing of the investigation of the file.

Q:      And would you agree with me that the majority of that information can be obtained by GuideOne with the use of the ATO that the insureds signed?

A:      I wouldn't agree with that, … Sometimes you can get information and sometimes you can't.

… and continuing,

Q:      All right.  I want to talk specifically about Kenneth and Janet Rock.

A:      Okay.  Specifically, I can't recall what we could obtain with that authorization to obtain.  And sometimes, again, you can't. Sometimes it's quicker for the insureds to get the information on their own. They can go to the bank and they can get their information fairly quickly.

Q:      Would you just trust the insured to bring all the information that the bank has, or would you rather have that information obtained yourself?

A:      It depends on what the items were.

Q:      Financial records.

        A:      We would ask them to provide us what they had.

        Q:      Okay. So if Kenneth and Janet Rock walked in and handed you a stack of financial documents and said, "That's all I've got," you would just go with that?

             MR. AMOS: I'm going to instruct you not to answer the question with speculation.

             MS. PITTMAN: You're instructing her not to answer on speculation?

             MR. AMOS: Yeah…

*Id.* at 112-114.

The reason counsel for the Plaintiffs instructed Ms. Alverio not to answer is because the answer is so obvious, so fundamental to the very purpose of the ATO, that anything other than "absolutely not" borders on absurdity. There is absolutely no circumstance under which the Defendants could have obtained their own bank records, provided those to the Plaintiffs, and satisfied the Plaintiffs. The Plaintiffs were not even satisfied with the documents they received pursuant to their own ATO. This is an elementary and fundamental question involving the efforts of a sophisticated Plaintiff.

The Plaintiff, an insurance company, who, in the regular course and daily conduct of business, repeatedly and routinely requests bank, financial, credit, employment, and other records, using this ATO as issued to executed by the Defendants. If, as Ms. Alverio has testified, this ATO would not necessarily have allowed the Plaintiffs to obtain the necessary information to evaluate these claims, it is these sophisticated, corporate Plaintiffs who bore the burden of, and were in the best position to, prepare the necessary documents for execution or take the necessary steps to obtain those documents by other means.

As an example of the same, on or about March 26, 2006, the Plaintiffs ran into difficulty with obtaining the Defendants' telephone records from the Bellsouth Compliance Center. The Plaintiffs contacted the Defendants, by letter, advising the Defendants of additional steps the Defendants would be required to take in assisting the

Plaintiffs with obtaining the relevant phone records. See Letter attached as Exhibit "I" to [Doc. 165] (referred to herein as Exhibit "I". Astonishingly, these Defendants who were allegedly doing all they could to withhold documents and information from the Plaintiffs, executed additional documents and **paid up front the $90.00 fee required for the Plaintiffs to obtain the information.** *Id.* at p. 2. The Plaintiffs could have undertaken this very same process to obtain any other information required to conduct its investigation into these homeowner and auto claims. The Defendants have made clear by their compliance with the Plaintiffs request for additional steps to be taken to assist in the investigation of these claims related to phone records that they would also have complied with any additional requests made by the Plaintiffs in an effort to obtain financial records. The Plaintiffs never took any such additional action.

These Defendants wholly and completely complied with their after-loss duties related to providing their financial records. And, at the end of the day, when the rubber met the road, Ms. Alverio had no choice but to admit that she, in fact, could not recall anything at all, of any nature whatsoever, that the Defendants failed to produce or any manner in which they failed to cooperate. From Alverio's deposition testimony:

> Q: So I just want to make myself clear. If your decisions in this letter to rescind the policy are based solely on recommendations from Dan Webb, recommendations from … Joey Hines and recommendations from Rick Eley, fine. **But if there's something that you contend that the Rocks failed to do or did not give to GuideOne, I want to know about that**.
>
> MR. AMOS: If you recall.
>
> A: I don't recall **anything**.
>
> Q: All right.

Deposition of Kathleen Alverio, at p. 98. (bold emphasis added)

The Defendants fully complied with every request made of them by the Plaintiffs. The Plaintiffs' employee, who signed the denial and recision, Ms. Alverio, has admitted that, after conducting her investigation, and preparing to testify regarding her role in these matters, she did not recall anything that the Defendants failed to do or did not give to GuideOne Insurance company. For these reasons, it is clear that the Plaintiffs' ground for denial and recision based upon "failure to provide documents and other information in violation of the policy" is without basis in fact, and, therefore, there is no legal basis to deny the claim or rescind the policy based upon such. It is undisputed that Defendants did not actually fail to provide, refuse to provide, or withhold documents from the Plaintiff – as made clear by Ms. Alverio's reluctant admission of the same. It is without dispute that Defendants executed an ATO.

At the time the Plaintiffs issued the Defendants a policy of insurance, the Plaintiffs ran a Transunion credit report for the Defendants. On April 23, 2004, the Defendants had a Transunion credit score of 674. See 2004 Credit Report attached as Exhibit "D" to [Doc. 165] (referred to herein as Exhibit "D"). The Defendants were, at the time the policy was issued, current on most bills, and had the following medical accounts in collection:

|                     |           |
|---------------------|-----------|
| Franklin Collection | $79.00    |
| Franklin Collection | $94.00    |
| Franklin Collection | $233.00   |
| Franklin Collection | $5,680.00 |
| Franklin Collection | $271.00   |
| Franklin Collection | $3,685.00 |
| Franklin Collection | $880.00   |
| Franklin Collection | $286.00   |
| Franklin Collection | $114.00   |

Immediately following the fire loss, the Plaintiff ran a Transunion credit report for the Defendants. On August 30, 2005, the Defendants had a Transunion credit score of 671. See 2005 Credit Report attached as Exhibit "E" to [Doc. 165] (referred to herein as Exhibit "E"). The Defendants were current on **all** bills and were making payments on

some minor, unexpected medical bills which were in collection with Franklin Financial and Alliance Collections. *Id.* At the time of loss, Defendants had the following medical accounts in collection:

| | |
|---|---|
| Franklin Collection | $192.00 |
| Franklin Collection | $79.00 |
| Franklin Collection | $94.00 |
| Alliance Collection | $330.00 |

*Id.* at p. 1-2.

The Defendants were in **substantially worse financial condition** at the time the Plaintiffs **issued a policy of insurance** than their financial condition at the time of the fire loss. The Defendants had **paid down thousands of dollars** in medical debt and were current on **all** other bills at the time of the fire loss. The Defendants argue that there is no conceivable circumstance in which reasonably prudent people, especially those who are not behind in credit card payments, are current on their mortgage, and have two teenage children residing with them would burn their family home to the ground over the last couple of hundred remaining dollars in medical expenses out of thousands of dollars of medical expenses already paid down over time.

The Plaintiffs' have, at all times relevant to this cause of action, been in possession of a full and complete authorization which gave them unrestrained access to the Defendants' financial histories. The Plaintiff had the authorization, means, and wherewithal to go to whatever steps necessary to obtain whatever financial information they were interested in. In any event, and regardless of the Plaintiffs' expressed reason for denial of coverage under these policies, whether or not the Plaintiffs' have a legitimate reason for denial of coverage and these claims is a question of fact for the jury and improper for a summary judgment ruling. *Murphree v. Federal Insurance Company,* 707 So.2d 523 at 529, *See Pioneer Life Ins. Co.,* 513 So.2d 927; *State Farm Fire & Casualty Co. v. Simpson,* 477 So.2d 242 (Miss. 1985).

**B.      Alleged misrepresentations regarding Mr. Rock's past conviction**

In April of 2004, Janet Rock placed a telephone call to Agent Tina Bailey to obtain an insurance quote. Kenneth Rock was not a party to that conversation. Agent Bailey took extensive notes regarding her conversation with Defendant Rock. *See* Exhibit "M" to [Doc. 165] (referred to herein as Exhibit "M".  There exists a genuine, material, and disputed issue of fact as to whether or not Tina Bailey ever asked Janet Rock, during their telephone conversation, whether or not any member of the Rock's household had ever been convicted of anything other than a traffic violation. Agent Bailey's notes do not reflect any recording related to that question. Janet Rock has repeatedly testified that she was never asked a question regarding the criminal backgrounds of the members of her household. Whether or not Tina Bailey asked Janet Rock, in that telephone conversation, any question related to criminal background, can only be decided when the jury makes a credibility determination and decides whether to believe Tina Bailey or Janet Rock. However, whether or not that question was asked is a question of fact for the jury and improper for a summary judgment ruling.

What is undisputed, is that following that telephone conversation, Tina Bailey took her notes and entered information into GuideOne's computer system to obtain a quote. Given the information Tina Bailey entered into the system, an application was generated which represented that no member of the Rock's household had ever been convicted of anything other than a traffic violation. Tina Bailey pre-printed that application and took the same with her to the Rock's home to obtain a signature.

The crux of this litigation rests in what actually occurred while Agent Bailey was present in the Rocks' home. However, everything that occurred, or did not occur, requires a finding of fact which is wholly improper for summary judgment.  Tina Bailey has testified to her account of the events which occurred in the Rocks' home. The Defendant's have testified to their version of the events which occurred at the Rocks'

home. These issues are material and disputed and must be submitted to the jury.

### C. Tina Bailey's Account

With regard to the time spent at the Rock's home finalizing their application, Tina Bailey specifically recalls the following:

1. That Kenneth Rock was present in the dining room at the time she allegedly reviewed the application for insurance with both Kenneth and Janet Rock simultaneously[8];

2. That Kenneth Rock was sitting in a position "taller[9]" than her;

3. That Kenneth Rock was either sitting on a "barstool" or leaning against a "bar"[10];

4. That she read aloud Question 1, of Section 1, which asks if any member of the household has been convicted of anything other than a traffic violation.

### D. The Rocks' Account

Janet Rock has testified that she and Agent Bailey sat at the dining room table, only the two of them, while Kenneth Rock watched television in the living room. *See* Exhibit "D" at p. 78-79. According to Janet Rock, Kenneth Rock did not come into the dining room until she "hollered at him". *Id.* at p. 81. Kenneth Rock has testified that he was not in the room, and certainly not at the dining room table, while Agent Bailey was talking with Janet Rock. *See* Deposition of Kenneth Rock, at p. 167, line 6. The Rocks do not now, nor have they ever, owned barstools. *See* Affidavit of Janet Rock, attached hereto as Exhibit "B1", *see also* Affidavit of Kenneth Rock, attached hereto as Exhibit "B". Further, at no time, did the Rocks' home ever have a "bar" or any structure which any reasonable person might construe as a "bar" in their dining room[11]. *Id.* In fact, the Rocks' dining room was enclosed by walls on all sides, excepting only the entry way into the dining room. *Id.* Though she has testified

---

[8] *See* Exhibit "L" at p. 106, line 113-114
[9] *Id.* at p. 146
[10] *Id.*
[11] The Rocks did not have a "bar" in their kitchen, or any other area of their home either.

adamantly to the contrary, there is absolutely no way Tina Bailey witnessed Kenneth Rock sitting on a barstool in that home or leaning against a bar. Likewise, though she testified adamantly to the contrary, there is absolutely no way Tina Bailey read Question 1 of Section 1 aloud to the Rocks because, if she had, Kenneth Rock would have responded truthfully. *Id.*

Ultimately, no one other than Tina Bailey recalls Kenneth and Janet Rock being in the dining room together prior to his signing the application, no one other than Tina Bailey recalls reviewing the application with the Rocks' before obtaining their signatures, and no one other than Tina Bailey recalls Question 1 of Section 1 being read aloud. And, Tina Bailey recalls these crucial events in the only way that benefits Tina will allow her to keep her job and avoid being sued by GuideOne as a result of her negligence. Clearly, these are not issues of law which may be decided on summary judgment.

Reasonable jurors could find that Tina Bailey never asked Janet Rock, during their telephone conversation, about her household members' criminal backgrounds. Reasonable jurors could find that Tina Bailey, as she had testified, entered into the GuideOne computer system that no member of the Rocks' household had been convicted of a crime, **without** ever asking Janet Rock the same. Reasonable jurors could find that, as she has testified, Tina Bailey went to the Rocks' home with a pre-printed application. Reasonable jurors could find that neither Kenneth nor Janet rock ever told Tina Bailey that no member of the household had been convicted of a crime and that Defendant Kenneth Rock signed his name where Tina Bailey pointed without either Janet or Kenneth Rock having any inclination that the application contained a misrepresentation because Tina Bailey had entered incorrect information into the computer system. The undisputed fact remains that the application was brought to the Rocks' house with "No" pre-filled in as the answer to Question 1 of Section 1. Why Tina Bailey chose to check that box, by her own negligence or by a misrepresentation by Janet Rock, is a question of

19

fact for the jury. Whether or not Tina Bailey knowingly entered into the computer system a "No" answer to Question 1, Section 1 without asking Janet Rock that question, and then sat by and watched as the Rocks signed the application without Tina Bailey asked them whether or not her recorded answer to Question 1, Section 1 was correct, is a fact question only proper for the jury.

It is absolutely impossible that Tina Bailey recalls, as she has testified, Kenneth Rock sitting on a barstool or leaning against a bar. That never happened. Though Tina Bailey has testified to an independent, however fictitious, memory of the same. Tina Bailey also has an independent, however fictitious, memory of reading aloud questions 1 through 4 of Section 1 of the application for homeowner's insurance. It is impossible that Tina Bailey read those questions aloud because, if she did, Kenneth Rock would have answered truthfully. The Rocks are entitled to have the jury weigh the credibility of Tina Bailey, Janet Rock, and Kenneth Rock, and make their credibility determination and render a verdict based upon the same.

### III. Plaintiff is estopped from denying coverage and rescinding the insurance policy.

Under Mississippi law, an insurer's right to rescind an insurance policy due to material misrepresentations on an insurance application is removed if an insurance agent takes charge of preparing the application and records information inaccurately. *See, e.g., National Life & Accident Ins. Co. v. Miller*, 484 So.2d 329, 334 (Miss.1985); *World Ins. Co. v. Bethea*, 230 Miss. 765, 93 So.2d 624 (Miss.1957), *Planters Ins. Co. v. Myers*, 55 Miss. 479 (1877). It is without dispute that in obtaining the relevant automobile and homeowners insurance policies, Defendant Janet Rock contacted Tina Bailey, Plaintiffs' agent, for a quote. See Deposition of Tina Bailey, Exhibit "L" at p. 27. It is further without dispute that during that telephone conversation, Ms. Bailey **asked Defendant Rock what Ms. Bailey considered significant** information to preparing the application and that Ms. Bailey prepared the application for insurance based upon her notes from that

conversation. See Notes of Tina Bailey, Exhibit "M". Ms. Bailey took the information contained in her notes from the April 20, 2004 telephone conversation with Defendant Janet Rock and entered that information into a computerized rating system used by GuideOne. See Deposition of Tina Bailey, Exhibit "L" at p. 55. Tina Bailey took charge of completing this application on the Defendants' behalf in the course and scope of her employment with Plaintiffs'. *Id.* at p. 86-87, 91-102. The application reflected true and accurate responses from Defendant Janet Rock to every question asked of her by Tina Bailey. There is no reference in Ms. Bailey's notes to her ever asking any questions regarding criminal history. See, Exhibit "M". Ms. Bailey simply never asked Janet Rock if either Kenneth or Janet Rock had criminal history.

While there exists a genuine issue of material fact as to whether or not Ms. Bailey asked the question[12], there is no dispute as to whether or not the Plaintiffs had a well developed "check and balance" process to make sure they were given accurate information with regard to prior losses prior to issuing a policy. See Deposition of Julie, attached as Exhibit "N" to [Doc. 165], at p. 78-79 (referred to herein as Exhibit "N1"). In response to deposition questioning, Julie Leniton, Senior Underwriter and the Plaintiffs' corporate designee for underwriting, stated as follows:

> Q: Now, we talked about a check and balance with respect to the prior property claims. What, if any, check and balance does GuideOne have in effect as of March of 2004 to make sure that they receive accurate information with respect to the felony conviction provision of their eligibility requirements?
>
> A: We don't run any conviction or reports of that nature.
>
> …
>
> Q: ... How would you define … the requirement that a potential insured have no property losses within the past three years? ... How important?

---

[12] The question at issue is whether or not Ms. Bailey asked, in her telephone conversation with Ms. Rock, if either of the Defendants had any criminal history.

A:  Very important.

...

Q:  What about same question for a prior felony conviction?

A:  Very important.

Q:   Do you know of any reason why GuideOne would have a check and balance in effect for one very important eligibility requirement and not another?

A:  No.

*Id.* at 79-80.

The Defendants' potential criminal backgrounds were not important enough to the Plaintiffs to check into, until such time as they were given the order that this fire would be a "substantial loss" and they needed to "look into arson" and any other conceivable means to get the company out of its obligations under this policy.  See, Email, attached as Exhibit "O" to [Doc. 165] (referred to herein as Exhibit "O". Though there is a genuine issue of material fact with regard to whether or not Ms. Bailey ever asked the Defendants about potential criminal history, there is no dispute that the Plaintiffs have already demonstrated a lack of good faith in making a serious effort to obtain Defendants' financial records. Plaintiffs were careless and negligent in its underwriting process. They could have treated criminal background as they did prior losses given that, according to the Plaintiffs, both are "very important" eligibility requirements. However, the Plaintiffs were contended to overlook, or be willfully blind, to one "very important" eligibility requirement (prior criminal background) until such time as Plaintiffs needed an "out" to circumvent its duties under this policy related to this "substantial loss". *Id.*

Promissory estoppel is a doctrine which prevents a promisor from rescinding a promise once a promisee had relied to his or her detriment. The Plaintiffs extended a policy of insurance to these Defendants, and later renewed that policy one year later,

when the Plaintiffs were in less than perfect financial condition and Mr. Rock had a less than perfect criminal background. The Defendants relied on their agent to generate a proper application. The Defendants relied, to their detriment, on the Plaintiffs promise of insurance coverage. Justice requires that the Plaintiffs own business failures, negligence, and lack of good faith not provide the Plaintiff with a way of escape from covering these claims which leaves the Defendants without remedy. Justice requires that the Plaintiffs be estopped from denying coverage and rescinding these policies.

## BAD FAITH

### I.    Defendants' bad faith counterclaims survive summary judgment.

The facts contained herein set out sufficient summary judgment evidence to establish that each and every element of the Plaintiffs' Motion for Summary Judgment requires this honorable Court to make a factual finding or a credibility determination. The pleadings, depositions, and Affidavits currently before the Court establish, conclusively, that there is a genuine issue of material fact as to whether or not the Defendants made material misrepresentations on their application for insurance. *See* Deposition of Tina Bailey, Affidavit of Janet Rock, Affidavit of Kenneth Rock. This Court cannot, therefore, find that the Defendants' are not entitled to coverage because of these alleged misrepresentations.

Because there remains a genuine issue of material fact as to whether or not misrepresentations were made on the Defendants' application for homeowner's insurance, the Defendants' pray this honorable Court will deny the Plaintiffs' Motion for Summary Judgment in its entirety.

The facts contained herein establish, without controversy, that the Plaintiffs employed underhanded tactics, withheld information, denied the Defendants the opportunity to fully discover relevant information, knew that a Preliminary Report existed and allowed Rick Ely to lie under oath regarding the existence of the same,

utilized the full extent of their wherewithal to take extra steps to obtain telephone records, but have denied the Defendants' legitimate claims because of the **Plaintiffs'** refusal to undertake additional steps to obtain whatever additional financial information they may have desired, give rise to the likelihood that reasonable jurors could disagree as to whether or not this was, in fact, a good faith investigation or a results oriented mission.

Because this honorable Court cannot properly grant summary judgment as to the existence of coverage in this cause, and because reasonable minds could differ as the existence and legitimacy of the Plaintiffs' stated reason, the Defendants' must be allowed to proceed to a jury with their bad faith claims. *See*, *Broussard v. State Farm Fire and Casualty Ins. Co.*, 523 F.3d 618 at 627 (5th Cir. 2008).

**WHEREFORE PREMISES CONSIDERED,** the Defendants respectfully pray that this Court will deny the Plaintiffs' Motion for Summary Judgment in its entirety.

THIS the 12th day of May, 2009.

s/Mona T. Pittman
MONA T. PITTMAN, BAR NO. 9754
ATTORNEY FOR THE DEFENDANTS

OF COUNSEL:
KELLY LAW FIRM
POST OFFICE BOX 1631
BATESVILLE, MS 38606
662-563-0411
662-563-0631 fax

## <u>CERTIFICATE OF SERVICE</u>

I, Mona T. Pittman, hereby certify that I have this day electronically filed the

foregoing Defendants' Response in Opposition to Plaintiffs' Motion for Summary

Judgment via the ECF filing system which provided electronic notice to the following:

> Marc D. Amos
> Nicholas, Crowell, Gillis, Cooper & Amos
> Post Office Box 1827
> Columbus, MS 39703

This the 12th day of March, 2009.

s/Mona T. Pittman_____
MONA T. PITTMAN
